UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

HUMANA HEALTH PLAN, INC. et al.,                                              Petitioners,

v.                                                      Civil Action No. 3:22-cv-226-DJH-CHL

RITE AID HDQTRS. CORP. and
RITE AID CORPORATION,                                                       Respondents.

* * * * *

**<u>MEMORANDUM OPINION AND ORDER</u>**

Petitioners Humana Health Plan, Inc.; Humana Insurance Company; and Humana Pharmacy Solutions, Inc. (collectively "Humana") seek confirmation of an arbitration award against Respondents Rite Aid Hdqtrs. Corp. and Rite Aid Corporation (collectively "Rite Aid"). (Docket No. 1)  "[T]he arbitration concerned [the respondents'] obligation to accurately report to Humana . . . the 'usual and customary' ("U&C") prices [the respondents] charged to its cash customers for prescription drugs."  (*Id.*, PageID.2 ¶ 2)  Rite Aid opposes the petition and has filed a counter-motion for vacatur or, in the alternative, modification of the arbitration award.  (D.N. 38; D.N. 40)  On May 10, 2023, the Court heard oral argument on the petition and counter-motion. (D.N. 60)  After careful consideration, and for the reasons set out below, the petition to confirm the arbitration award will be granted, and the counter-motion will be denied.

**I.**

Because the parties do not dispute the accuracy of the arbitrator's factual summary in his Opinion and Final Award (*see* D.N. 1; D.N. 38; D.N. 40), it is incorporated herein:

> Humana is comprised of Humana Health Plan, Inc., a health maintenance organization; Humana Insurance Co., an insurance company that provides health insurance and prescription drug coverage; and Humana Pharmacy Solutions, Inc., a pharmacy benefits manager (PBM) that manages pharmacy benefits for Humana

1

members.  Rite Aid . . . own[s] and operate a large retail drugstore chain in the United States.

Since the early 2000s, Rite Aid contracted with Humana to accept claims for prescription benefits under Humana insurance plans and to be reimbursed by Humana subject to the terms of reimbursement provided for in the contracts.

In 2006, the pharmacy landscape changed drastically when Medicare Part D went into effect, providing millions of Medicare beneficiaries with prescription benefit assistance for the first time.  In response to Medicare Part D, many big-box stores, including Walmart, Target, Kroger, and Costco, began offering generic drug discount programs, which lowered prices to as low as $4 for certain prescription drugs.  These discount programs were available to all customers, whether insured or uninsured, and thus the pharmacies generally reported the discounted prices as the U&C charge.  Given the low prices and ease with which customers could obtain the discounted prices, stores like Walmart and Target began to attract and obtain a significant market share of the uninsured and underinsured pharmacy customers.

Several pharmacies sought to regain some of that market share by implementing their own discount drug programs.  In September 2008, Rite Aid launched a membership program called the RX Savings Program ("RSP").  The RSP was designed to attract cash-paying customers by offering discounted pricing for certain prescription drugs to its members.  To enroll in the program, a customer had to sign an enrollment form and agree to several terms, including a marketing consent that permitted Rite Aid to use the customer's personal information to send direct, personalized marketing; and a HIPAA waiver, to enable Rite Aid to disclose personal health information to the third party administering the RSP.  There was no monetary enrollment fee.

On April 1, 2008, five months prior to launching the RSP, Rite Aid and Humana negotiated a new base contract and executed a National/Regional Chain Pharmacy Provider Agreement (the "2008 Agreement").  The 2008 Agreement defined the applicable laws and regulations, as well as the parties' responsibilities under the agreement regarding the submission of claims and reimbursement terms.  Of particular relevance to th[e] arbitration [in this matter], the key reimbursement pricing metric of the 2008 Agreement rested upon Rite Aid's [U&C] charge.  The agreement, however, did not explicitly define U&C, and unsurprisingly (given that the 2008 Agreement was executed prior to the launch of the RSP), did not reference the RSP or RSP pricing.

In August 2013, Rite Aid and Humana renegotiated the 2008 Agreement and executed a new National/Regional Chain Pharmacy Provider Agreement (the "2013 Agreement").  The terms of the 2008 Agreement and 2013 Agreement (collectively, the "Agreements"), were materially the same, with only slight variations in the language of the provisions.  The 2013 Agreement, like the 2008 Agreement, did not explicitly define U&C or reference the RSP.

2

In 2017, Humana learned through a series of legal actions against Rite Aid that Rite Aid, purportedly, was falsely reporting U&C prices by failing to report RSP prices as its U&C charge.  On January 10, 2018, Humana sent a Notice Letter to Rite Aid inquiring about its reporting practices for U&C charges and requested cash transaction data from Rite Aid to confirm the accuracy of Rite Aid's U&C submissions.  On July 31, 2018, Rite Aid rejected Humana's request for the cash transaction data.  Rite Aid also confirmed, for the first time, that it did not include RSP prices in the U&C prices it reported to Humana.

(D.N. 1-1, PageID.16–17)[1]

On February 6, 2019, Humana "filed its [d]emand for [a]rbitration," and "the parties agreed to a remote video-conferenced evidentiary hearing."  (*Id.*, PageID.14)  Humana asserted claims against Rite Aid for breach of contract (Count I), fraud (Count II), negligent misrepresentation (Count III), and unjust enrichment (Count IV).  (*Id.*, PageID.18)  Count I alleged that "Rite Aid breached the terms of the Agreements by falsely reporting U&C charges to Humana."  (*Id.*)  Counts II and III alleged that "Rite Aid made affirmative misrepresentations as to Rite Aid's true U&C price with each claim submission by failing to submit RSP prices as U&C, thereby falsely inflating the U&C price."  (*Id.*, PageID.41)  And Count IV alleged that "Rite Aid's failure to report RSP prices as its U&C induced overpayments from Humana and constitutes an unjust enrichment."  (*Id.*)  Rite Aid denied and disputed all allegations.  (*Id.*, PageID.15)

After a nine-day evidentiary hearing, the arbitrator entered judgment and issued an award in favor of Humana on Count I (breach of contract), which was accompanied by an opinion

---

[1] The only factual dispute is outlined in a footnote in Rite Aid's counter-motion:

Technically, the petitioners in this action comprise two health insurance companies and a pharmacy benefit manager, and the respondents in this case are a holding company and its operating subsidiary, as opposed to the owner-operator of any individual pharmacy stores.  But these distinctions are immaterial for purposes of this opposition and counter-motion.

(D.N. 40, PageID.4321 n.1)

explaining its factual and legal bases. (*Id.*, PageID.10–59)  The award required Rite Aid to pay Humana a total of $122,564,346: $69,587,582 for direct overcharges; $12,230,446 for extrapolated damages; and $40,746,318 for prejudgment interest. (*Id.*, PageID.59)  Humana then filed a petition with this Court to confirm the arbitration award pursuant to the Federal Arbitration Act, 9 U.S.C. § 9. (D.N. 1)  In response, Rite Aid opposes the petition and has filed a counter-motion for vacatur or, in the alternative, modification of the arbitration award. (D.N. 38; D.N. 40)  On May 10, 2023, the Court heard oral argument on the petition and counter-motion and took the matter under advisement. (D.N. 60)

## II.

The Federal Arbitration Act (FAA) "presumes that arbitration awards will be confirmed." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000) (citing 9 U.S.C. § 9; *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998)).  Thus, "[w]hen courts are called on to review an arbitrator's decision, the review is very narrow; one of the narrowest standards of judicial review in all of American jurisprudence." *Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (quoting *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 305 (6th Cir. 2008)); *see, e.g.*, *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted).  "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error." *Samaan*, 835 F.3d at 600 (quoting *Solvay Pharm., Inc. v. Duramed Pharm., Inc.*, 442 F.3d 471, 476 (6th Cir. 2006)).  Instead, "if a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Merrill Lynch, Pierce, Fenner & Smith v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995).  Thus, the party seeking to vacate an arbitration award "must clear a high hurdle." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

The FAA provides that an award may be vacated under the following circumstances:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).    Additionally, the Sixth Circuit "recognizes a fifth—perhaps collective shorthand—ground for vacatur: an arbitrator's manifest disregard of the law." *Gibbens v. OptumRx, Inc.*, 778 F. App'x 390, 393 (6th Cir. 2019) (collecting cases).

Even if an award cannot be vacated, it can be modified or corrected in the following situations:

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

9 U.S.C. § 11.

## A.    Vacatur

As grounds for vacatur, Rite Aid asserts that the arbitrator (1) "exceeded its power by awarding Humana damages for alleged injuries suffered by individuals who were not parties to the

arbitration," and (2) "showed manifest disregard for the law."  (D.N. 38, PageID.346–71)  The Court will address each argument in turn.

### 1.  Scope of Power

Rite Aid first argues that "the Arbitrator awarded Humana many millions of dollars to compensate for alleged losses incurred not by Humana, but by individuals with Humana insurance, often referred to as Humana's 'members' or 'insureds.'"  (*Id.*, PageID.346 (citations omitted)) Rite Aid contends that "[n]early $10 million of the Arbitrator's award provides compensation for transactions in which Humana insureds paid the full cost through copayments or deductibles, and still more of the award provided compensation for transactions where Humana and the insured shared the costs."  (*Id.*, PageID.346–47 (citation omitted))  Rite Aid further argues that the Sixth Circuit and Seventh Circuit have vacated awards where the arbitrator determined the rights of individuals who were not part of the arbitration proceedings.  (*Id.*, PageID.346 ("It is settled in the Sixth Circuit and elsewhere that when arbitrators 'determin[e] the rights of individuals who were not parties in the arbitration proceedings,' they exceed their authority and vacatur is warranted under 9 U.S.C. § 10(a)(4) to correct the unlawful exercise of power." (quoting *NCR Corp. v. Sac-Co.*, 43 F.3d 1076, 1080 (6th Cir. 1995))); *see id.* (citing *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1256–57 (7th Cir. 1994)))

In response, Humana contends that Rite Aid never raised this argument during arbitration and that it "has long been settled in th[e] [Sixth] Circuit that a party cannot raise new arguments on a motion to vacate."  (D.N. 41, PageID.9304 (citing *Order of Ry. Conductors & Brakemen v. Clinchfield R. Co.*, 407 F.2d 985, 988 (6th Cir. 1969); *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747, 752 (6th Cir. 2003); *Armco Emps. Indep. Fed'n, Inc. v. AK Steel Corp.*, 149 F. App'x 347, 352 (6th Cir. 2005)))  Humana further argues that even if Rite Aid did not waive

this argument, there is no evidence that the arbitrator awarded damages to nonparties.   (*Id.*, PageID.9305–08)

The Sixth Circuit has held that arguments that are not raised during arbitration proceedings are waived on a motion to vacate, *see Gibbens*, 778 F. App'x at 395 (collecting cases), and that an arbitration award may be vacated if the arbitrator awards damages to nonparties.  *NCR Corp.*, 43 F.3d at 1080–81.  As an initial matter, Rite Aid did not raise this argument during the arbitration proceedings.  (*See* D.N. 38-1; D.N. 38-21; D.N. 38-22)  "As such, this argument is waived." *Gibbens*, 778 F. App'x at 395 (collecting cases).  Even if it were not waived, however, the argument would still fail for the reasons explained below.

a.   *NCR Corp.*

To begin, the Court considers the case cited by Rite Aid in support of its argument that the arbiter improperly awarded damages to nonparties: *NCR Corp.*, 43 F.3d at 1080.  (D.N. 38, PageID.346 (citation omitted))  The facts in this matter are not analogous.  There, NCR "a manufacturer and seller of data processing equipment, including electronic cash registers," entered "into a dealer agreement with Sac–Co (hereinafter "Acme") in which NCR appointed Acme to be an authorized, nonexclusive dealer for the purchase and resale of NCR equipment.  The agreement provided for arbitration of any dispute arising out of the agreement."  43 F.3d at 1078.  Shortly after entering the agreement, NCR filed suit against Acme for claims arising out of a contract dispute, and the parties pursued the matter in arbitration."  *Id.*  As part of its award, the arbitrator "assessed punitive damages against NCR in the amount of $1,335,180."  *Id.*  The punitive damages were to be paid to "all of NCR's United States nonservicing dealers even though only one nonservicing dealer, Acme, was a party to the action before the arbitrator."  *Id.*  The arbitrator explained: "It should be specifically noted that the damages which I have labeled punitive, I have

awarded against NCR. *I have not awarded them in favor of* Acme and that is a conscious decision." *Id.* (emphasis in original). NCR filed a motion to vacate the award for punitive damages, and the magistrate judge granted the motion, "finding that the arbitrator exceeded his powers in awarding damages to nonparties." *Id.* at 1079. And the magistrate judge refused to award all of the punitive damages to Acme on the grounds that (1) the FAA "does not authorize courts to modify the substance of arbitration awards, and (2) the arbitrator's express intent was to not award all of the punitive damages to Acme." *Id.* The Sixth Circuit affirmed the judgment: "The award in the case at hand is not ambiguous. . . . It is . . . clear that the arbitrator assessed punitive damages against NCR in the amount of $1,335,180 to a class of NCR dealers not parties to the arbitration. Thus, remand is not an appropriate remedy." *Id.* at 1081.

In the present case, the arbitrator specifically and unequivocally awarded damages to Humana—a party to the arbitration proceedings. (*See* D.N. 1-1, PageID.56 ("I find that $69,587,572 reflects the amount of direct overcharges that Humana is entitled to recover."); *id.*, PageID.57 ("I find that Humana is entitled to $12,230,446 in extrapolated damages."); *id.*, PageID.59 ("I find that Humana is entitled to an award of prejudgment interest in the amount of $40,746,318.")) And at no point did the arbitrator assess damages against Rite Aid to nonparties to the arbitration. (*See id.*, PageID.56–59) *NCR Corp.* is therefore inapposite, and the Court rejects Rite Aid's argument that its reasoning is relevant here. 43 F.3d at 1078–81.

### b. *Eljer*

The Court next considers the applicability of *Eljer*, 14 F.3d at 1252, and concludes that it is similarly distinguishable. Eljer and its subsidiary, Simonds Division, entered into a joint business venture with Kowin, forming Kowin-Simonds, Inc. *Id.* To aid the joint venture: "Simonds agreed to sell its excess manufacturing equipment for a total price of $3.5 million";

"Kowin–Simonds bought some of this equipment with the proceeds of a $2.5 million loan from the Bank of America"—"Kowin and Eljer each guaranteed $1.25 million of the loan"; and "[t]he rest of the necessary equipment was purchased for $1 million by the Bank of China which in turn leased the equipment back to the . . . joint venture." *Id.* The joint venture failed, however. As a result, "Kowin–Simonds was unable to meet its obligations on the Bank of America loan and, as guarantors, Eljer and Kowin were each forced to pay the bank $1.25 million plus accrued interest." *Id.* at 1253.

A few years later, Kowin sued Eljers and Simonds. *Id.* The parties proceeded to arbitration, and the arbitrator awarded, in part, $3.5 million to Kowin which "represented what Kowin alleged to be Simonds's unjust enrichment from the sale of its equipment." *Id.* Eljer subsequently filed a motion to vacate or modify the award, and the district court reduced the award by $2.5 million to avoid double recovery after concluding that "what Kowin alleged to be Simonds's unjust enrichment from the sale of its equipment" was already included in the first award. *Id.* Both parties appealed to the Seventh Circuit. *Id.* at 1254–57.

The Seventh Circuit explained that in "its reduced form, the award is comprised solely of the fee which Eljer received from the Bank of China for some of Simonds's equipment"; and therefore, it concluded that the arbitrator exceeded his powers under the contract by (1) awarding Kowin with damages for a loss it did not suffer and (2) arbitrating disputes between Eljers and a third party, the Bank of China. *Id.*; *see id.* at 1256–57 ("The language of the [Kowin and Simonds's arbitration] clause limits arbitration to disputes arising under the contract. The transaction between the Bank of China and Eljer was completely separate from the Kowin–Simonds agreement and was therefore outside the scope of the arbitration clause.") Thus, the Seventh Circuit vacated the damages award. *Id.* at 1257.

9

Here, by contrast, the arbitrator did not award damages to Humana for a loss it did not suffer; award damages to or consider the claims of any nonparty; or award damages to Humana on behalf of its "members" or based on any damages suffered by those members.  (D.N. 1-1, PageID.44–59)  Instead, the arbitrator explicitly stated that the final award to Humana represents a "*full settlement of all claims submitted*"—i.e., Humana's breach-of-contract, fraud, negligent-misrepresentation, and unjust-enrichment claims arising under the contracts at issue—and that "[a]ll claims *not expressly granted* herein are hereby denied."  (*Id.*, PageID.59 (emphasis added))

Moreover, Michael J. Petron, Humana's damages expert, provided a report in which he calculated that Humana's direct overcharges and extrapolated damages ranged from $64,552,259 to $122,308,565.[2]  (D.N. 40-23, PageID.9102–07)  This range did not include any damages owed to Humana's members or prejudgment interest.  (*See id.*)  The arbitrator accepted the state-level, 25th-percentile calculations, finding that "Humana adequately offered a reasonable and

---

[2] Petron's report calculated the direct overcharges and extrapolated damages owed to Humana and its members at the national, regional, and state levels and at the lowest true U&C (10th percentile) and highest true U&C (25th percentile).  (D.N. 40-23, PageID.9102–07)  Based on those calculations, the report estimates that the direct overcharges owed to Humana ranged from $54,196,992 (25th percentile at the state level) to $102,050,280 (10th percentile at the national level), and the extrapolated damages owed to Humana ranged from $10,355,267 (25th percentile at the state level) to $20,258,285 (10th percentile at the national level).  (*Id.*)  Thus, Petron concluded that the total damages owed to Humana ranged from $64,552,259 (25th percentile at the state level) to $122,308,565 (10th percentile at the national level).  (*Id.*)  The full breakdown is outlined below.

The direct overcharges owed to Humana were calculated as (1) $102,050,280 (10th percentile) or $81,296,160 (25th percentile) at the national level (*id.*, PageID.9102); (2) $86,031,818 (10th percentile) or $71,398,333 (25th percentile) at the regional level (*id.*, PageID.9103); and (3) $60,756,862 (10th percentile) or $54,196,992 (25th percentile) at the state level.  (*Id.*, PageID.9104)  The extrapolated damages owed to Humana were calculated as (1) $20,258,285 (10th percentile) or $15,313,694 (25th percentile) at the national level (*id.*, PageID.9105); (2) $18,097,821 (10th percentile) or $14,233,286 (25th percentile) at the regional level (*id.*, PageID.9106); and (3) $12,091,149 (10th percentile) or $10,355,267 (25th percentile) at the state level.  (*Id.*, PageID.9107)

conservative approach to calculating damages." (D.N. 1-1, PageID.55) And the arbitrator ultimately awarded Humana $81,818,028 for direct overcharges and extrapolated damages—an amount well within the range set out in Petron's report. (*Compare id.*, PageID.47–57 (explaining the arbitrator's damages award), *with* (D.N. 40-23, PageID.9102–07 (detailing the range of damages owed to Humana)) The Sixth Circuit has made clear that "if a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Jaros*, 70 F.3d at 421. Because Petron's report provides a "conceivable rational basis supporting the [arbitrator's] decision" to award the specific amount of damages to Humana—without awarding any damages to non-members, *id.* at 422, the Court cannot find that the arbitrator "exceeded [his] powers." 9 U.S.C. § 10(a)(4). Vacatur on this basis is therefore unwarranted. *See id.*

### 2. Manifest Disregard

Rite Aid next argues that vacatur "is warranted because the Arbitrator showed [manifest] disregard for the law." (D.N. 38, PageID.351–71) Although the Supreme Court has expressly held that 9 U.S.C. §§ 10 and 11 "provide the FAA's exclusive grounds for expedited vacatur and modification," *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008), the Sixth Circuit continues to recognize that an arbitration award may also be vacated where the arbitrator shows a "manifest disregard of the law." *See, e.g.*, *Gibbens*, 778 F. App'x at 393–96; *Marshall v. SSC Nashville Operating Co.*, 686 F. App'x 348, 353 (6th Cir. 2017) ("We have previously held that despite the Supreme Court's language in *Hall St. Assocs.*, the 'manifest disregard' doctrine remains a viable ground for attacking an arbitrator's decision"); *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418–19 (6th Cir. 2008) (noting that because of the ambiguous holding of *Hall St. Assocs.*, the court "will follow its well-established precedent here and continue to employ the

'manifest disregard' standard"). Thus, the Court concludes that the Sixth Circuit's manifest-disregard test remains valid.

An arbitrator manifestly disregards the law when her decision "fl[ies] in the face of clearly established legal precedent." *Gibbens*, 778 F. App'x at 393 (citing *Jaros*, 70 F.3d at 421). Rite Aid can meet this standard by showing that "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrator[] refused to heed that legal principle." *Id.* (quoting *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 847 (6th Cir. 2003)). In other words, "the relevant law must be clearly defined and the arbitrator must have consciously chosen not to apply it." *Id.* at 394 (quoting *Dawahare*, 210 F.3d at 669). Importantly, a court "may set aside the arbitrator's decision only if, after applying 'clearly established legal precedent, . . . no judge or group of judges could conceivably come to the same determination'" as the arbiter. *Id.* at 393–94 (quoting *Elec. Data Sys. Corp. v. Donelson*, 473 F.3d 684, 691 (6th Cir. 2007)).

Rite Aid maintains that the arbitrator "showed [manifest] disregard for the law" in four ways. (D.N. 38, PageID.351–71) The Court will consider each argument in turn and apply this standard accordingly.

### a. Statute of Limitations

Rite Aid asserts that the arbitrator manifestly disregarded "Kentucky law requiring [the] application of Pennsylvania's statute of limitations under Kentucky's borrowing statute." (D.N. 38, PageID.352) Rite Aid contends that the alleged breach occurred in Pennsylvania and therefore the arbitrator should have applied Pennsylvania's statute of limitations to Humana's contract claims. (*Id.*, PageID.352–55) In response, Humana argues that the arbitrator correctly applied Kentucky's statute of limitations. (D.N. 41, PageID.9296–9303)

Kentucky's borrowing statute provides that

> [w]hen a cause of action has arisen in another state or country, and by the laws of this state or country where the cause of action accrued the time for the commencement of an action thereon is limited to a shorter period of time than the period of limitation prescribed by the laws of this state for a like cause of action, then said action shall be barred in this state at the expiration of said shorter period.

Ky. Rev. Stat. § 413.320.  For purposes of the statute, "where an action 'accrues' is inextricably intertwined with when it accrues." *Abel v. Austin*, 411 S.W.3d 728, 736 (Ky. 2013) (internal alteration omitted) (citing *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 243 n.7 (6th Cir. 2009)).  "The place where a cause of action arises is the place where the operative facts that give rise to the action occur. . . . [I]t is the happening of the last of such facts which brings the cause of action into existence[.]" *Id.* (quoting *Helmers v. Anderson*, 156 F.2d 47, 50 (6th Cir. 1946)).  Because "[a] cause of action does not exist until the conduct causes injury that produces loss or damage," *id.* (quoting *Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 126 (Ky. 1994)), "knowing when the 'final act' occurred that ripened the matter into a cause of action aids in ascertaining *where* the cause of action accrued." *Id.*; *see Helmers*, 156 F.2d at 51 ("The final act which transforms the liability into a cause of action necessarily has both aspects of time and place.  It occurs at a certain time and in a certain geographical spot.").

In the arbitrator's Decision on Choice of Law and Venue (D.N. 1-2), he applied Kentucky's borrowing statute and explained:

> [A]lthough Rite Aid made pricing determinations at its corporate headquarters in Pennsylvania, its decision was <u>not</u> the final action that brought Humana's claims into existence.  Instead, all of Humana's claims require, as an element, *proof of an injury*.  Humana's purported injury did not come into existence until it acted in reliance on Rite Aid's alleged improper calculation and overpaid Rite Aid based on that calculation.  Because Humana processed all payments in Kentucky, at its corporate headquarters, the cause of action accrued in Kentucky.  Accordingly, Kentucky's statute of limitations [is] applicable.

(*Id.*, PageID.71) Such an analysis and determination are consistent with the Sixth Circuit and Supreme Court of Kentucky's application of the borrowing statute. *See CMACO*, 589 F.3d at 243 n.7; *Helmers*, 156 F.2d at 50–51; *Abel*, 411 S.W.3d at 736; *Alagia*, 882 S.W.2d at 126. Thus, the Court cannot find that the arbitrator's decision "fl[ies] in the face of clearly established legal precedent." *Gibbens*, 778 F. App'x at 395 (citing *Jaros*, 70 F.3d at 421). Vacatur on this basis is therefore unwarranted. *Id.*

### b. Voluntary-Payment Doctrine

Rite Aid next argues that the arbitrator manifestly disregarded "Pennsylvania law" when he rejected Rite Aid's affirmative defense under the voluntary–payment doctrine. (D.N. 38, PageID.355–65) Humana responds that the arbitrator's "determination that Rite Aid failed to support its affirmative defense does not constitute a manifest disregard for the law." (D.N. 41, PageID.9308)

Under Pennsylvania law, the voluntary-payment doctrine is an affirmative defense, *Philidor Rx Servs. LLC v. Polsinelli PC*, 552 F. Supp. 3d 506, 517 (E.D. Pa. 2021), and therefore Rite Aid bears the burden of proof. *See Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1092 (Pa. 2012). The doctrine provides that a party "who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him . . . cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law." *Wayne M. Chiurazzi L. Inc. v. MRO Corp.*, 97 A.3d 275, 279 (Pa. 2014) (quoting *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 661 (Pa. 2009)); *see, e.g.*, *McLean v. Big Lots Inc.*, 542 F. Supp. 3d 343, 354 (W.D. Pa. 2021) (citation omitted); *Takeda Pharms. U.S.A., Inc. v. Spireas*, 400 F. Supp. 3d 185, 218 (E.D. Pa. 2019) (citation omitted). The Court will determine whether the arbiter's assessment of the voluntary-payment doctrine "fl[ies]

in the face of clearly established legal precedent." *Gibbens*, 778 F. App'x at 393 (citing *Jaros*, 70 F.3d at 421).

### i. Knowledge of Material Facts

Rite Aid contends that "[t]he [a]rbitrator ignored that, by his own findings, Humana had the means of knowing the facts material to its claim many years before Humana filed its arbitration demand." (D.N. 38, PageID.356–61) Rite Aid further argues that "Pennsylvania law does not require proof that when Humana paid Rite Aid's claims it possessed full knowledge of all facts— such as facts about the prices charged in every single Rite Aid prescription drug transaction over this period." (*Id.*, PageID.357)

Despite Rite Aid's argument to the contrary, Pennsylvania law makes clear that the voluntary-payment doctrine only applies if Humana had "full knowledge, or means of knowledge of all the facts" at the time that it paid money to Rite Aid. *Wayne M. Chiurazzi L. Inc.*, 97 A.3d at 279 (quoting *Liss & Marion, P.C.*, 983 A.2d at 661); *see Takeda*, 400 F. Supp. 3d at 218–19 ("[T]he voluntary payment doctrine does not apply[,] and a party can recover payments where the payments were made 'without full knowledge of the facts, or because of the other party's fraud, or under some type of duress.'" (citation omitted)). Thus, the arbitrator was required to evaluate the facts and evidence before him to determine whether the doctrine applied in the present case. *See e.g.*, *Camcara, Inc. v. Air Prod. & Chemicals, Inc.*, No. CV 21-2264, 2023 WL 2616017, at *12– *13 (E.D. Pa. Mar. 23, 2023) (evaluating the facts and evidence before the court to determine whether the doctrine was applicable); *In re Kent*, 615 B.R. 171, 185–86 (Bankr. W.D. Pa. 2020) (same); *Takeda*, 400 F. Supp. 3d at 218–19 (same); *Mericle v. Jackson Nat'l Life Ins. Co.*, 193 F. Supp. 3d 435, 452–57 (M.D. Pa. 2016) (same).

In reviewing the facts and evidence, the arbitrator found Humana's witnesses, who testified that "Humana lacked the information and ability to obtain information necessary to ascertain Rite Aid's true U&C prices," to be persuasive.  (D.N. 1-1, PageID.40)  Humana's witnesses specifically testified that (1) "although Humana had a 'small window' into what Rite Aid submitted for Humana members, Humana needed Rite Aid's cash transaction data, to which it had no access, to determine what prices cash customers were actually paying" (*id.*, PageID.40); (2) even though Humana could have invoked the audit provision of the 2008 and 2013 Agreements, it could not "examine the records and data concerning non-Humana members that was necessary for Humana to determine an accurate U&C price" (*id.*, PageID.40–41); (3) the public information available to Humana did not provide "insight into what prices non-Humana customers actually paid to Rite Aid pharmacies without cash transaction data" (*id.*, PageID.41 (citations omitted)); (4) "the vast majority of drugs dispensed to Humana members were not listed on the public formulary lists" (*id.*); (5) "there were hundreds to thousands of drugs for which there was no information" (*id.* (citations omitted)); and (6) "the public information was not stable."  (*Id.*)  And the arbitrator highlighted that "both Humana and Rite Aid witnesses acknowledged that the public formularies were constantly changing and were subject to variability based on quantity, costs, and changes to the drug list."  (*Id.* (citation omitted))

Based on the witnesses' testimony, the arbitrator concluded that Rite Aid failed to carry its burden.  (*Id.*)  Such a decision was supported by the evidence, well-reasoned, logical, and "does not—at all—indicate that he '. . . consciously chose[] not to apply [clearly defined law].'"  *Gibbens*, 778 F. App'x at 395 (quoting *Dawahare*, 210 F.3d at 669).  Accordingly, the Court cannot find that his decision "fl[ies] in the face of clearly established legal precedent," *id.* at 393 (citing *Jaros*, 70 F.3d at 421), or that "no judge or group of judges could conceivably come to the

same determination.'"  *Id.* at 393–94 (quoting *Elec. Data Sys. Corp.*, 473 F.3d at 691).  Vacatur

on this basis is therefore unwarranted.  *Id.*

### ii.  The Arbitrator's Stated Reasons

Rite Aid next argues that "[t]he Arbitrator's stated reasons for refusing to apply the

voluntary payment doctrine do not make up for the Arbitrator's manifest disregard of the law."

(D.N. 38, PageID.361–65)  Rite Aid specifically maintains that the arbitrator's findings that

Humana did not know the prices paid by non-customers and lacked full knowledge of variations

in Rite Aid's RSP prices over time do not support a refusal to apply the voluntary-payment

doctrine.  (*Id.*)  Even if the Court agreed with Rite Aid that the arbitrator made an error, Rite Aid's

claim would still fail.  *See Samaan*, 835 F.3d at 600 ("Courts must refrain from reversing an

arbitrator simply because the court disagrees with the result or believes the arbitrator made a

serious legal or factual error." (quoting *Solvay Pharm., Inc.*, 442 F.3d at 476)).  As outlined above,

the arbitrator listed multiple reasons why the voluntary-payment doctrine was inapplicable, and

each reason was based on evidence provided by Humana and Rite Aid.  (D.N. 1-1, PageID.40–41)

And the Sixth Circuit has clearly established that "if a court can find any line of argument that is

legally plausible and supports the award then it must be confirmed."  *Jaros*, 70 F.3d at 421.

Because there is a "conceivable rational basis supporting the [arbitrator's] decision," the Court

declines to disturb the award on this ground.  *Id.* at 422; *see Gibbens*, 778 F. App'x at 393 (citing

*Jaros*, 70 F.3d at 421).

### c.  Restatement (Second) of Contracts § 201

Rite Aid also claims that the arbitrator manifestly disregarded "Pennsylvania's adoption of

Restatement § 201."  (D.N. 38, PageID.365–67)  Rite Aid contends that it "extensively briefed

Section 201(2), its application in Pennsylvania precedent, and why it applied here to bind Humana

to Rite Aid's interpretation," and that the arbitrator "disregarded this rule, making no reference in

his decision to it or any of the authorities Rite Aid briefed." (*Id.*, PageID.366)  Humana responds

that the arbitrator "did not reference § 201 by name, but he analyzed – repeatedly and at length –

each party's understanding of the contractual term 'U&C' throughout the Final Award.  This was

all that was required and is consistent with the Restatement standard."  (D.N. 41, PageID.9311–

12)

> Section 201 of the Restatement (Second) of Contracts provides:
>
> (1) Where the parties have attached the same meaning to a promise or agreement
> or a term thereof, it is interpreted in accordance with that meaning.
> (2) Where the parties have attached different meanings to a promise or agreement
> or a term thereof, it is interpreted in accordance with the meaning attached by one
> of them if at the time the agreement was made
> > (a) that party did not know of any different meaning attached by the other,
> > and the other knew the meaning attached by the first party; or
> > (b) that party had no reason to know of any different meaning attached by
> > the other, and the other had reason to know the meaning attached by the first
> > party.
>
> (3) Except as stated in this Section, neither party is bound by the meaning attached
> by the other, even though the result may be a failure of mutual assent.

Restatement (Second) of Contracts § 201 (1981).  As an initial matter, Rite Aid does not provide,

nor is the Court aware of, any Pennsylvania law or federal law requiring the arbitrator to

specifically reference § 201 or every authority cited by a party in his Opinion and Final Award.

(*See* D.N. 38; D.N. 40)  In fact, the Sixth Circuit has articulated that "[a] decisionmaker does not

necessarily err simply because he or she does not address every argument raised by one of the

parties."  *Samaan*, 835 F.3d at 605 (citing *United States v. Collazo*, 818 F.3d 247, 260 (6th Cir.

2016)).  Moreover, a review of the Opinion and Final Award (D.N. 1-1) shows that the arbitrator

took § 201 into account by carefully and extensively evaluating the plain language of the 2008 and

2013 Agreements, policy arguments, and documentary and testimonial evidence presented by the

parties to determine whether the parties attached the same or different meanings to the contractual

term U&C.  (*Id.*, PageID.27–40)  In doing so, the arbitrator considered and rejected Rite Aid's arguments regarding the term.  (*Id.*, PageID.35–36)  The arbitrator ultimately concluded that the parties had adopted the National Council for Prescription Drug Programs' (NCPDP) definition of U&C.  (*Id.*, PageID.39)

Thus, the arbitrator's decision that the parties had attached the same meaning to the term U&C was supported by the evidence, well-reasoned, logical, and "does not—at all—indicate that he '. . . consciously chose[] not to apply [clearly defined law].'"  *Gibbens*, 778 F. App'x at 395 (quoting *Dawahare*, 210 F.3d at 669).  Accordingly, the Court cannot find that his decision "fl[ies] in the face of clearly established legal precedent," *id.* at 393 (citing *Jaros*, 70 F.3d at 421), or that "no judge or group of judges could conceivably come to the same determination.'"  *Id.* at 393–94 (quoting *Elec. Data Sys. Corp.*, 473 F.3d at 691).  Vacatur on this basis is therefore unwarranted. *Id.*

### d.  Pennsylvania Contract Law

Rite Aid's final argument is that the arbitrator manifestly disregarded "Pennsylvania contract law by treating trade usage as a question of law rather than a question of fact."  (D.N. 38, PageID.367–71)  Rite Aid asserts that when the arbitrator interpreted the contractual term U&C, he impermissibly relied on the "federal False Claims Act analysis of the district and circuit courts in" *United States ex rel. Garbe v. Kmart Corp.*  (*Id.*, PageID.367 (citing 73 F. Supp. 3d 1002 (S.D. Ill. 2014), *as amended* (Jan. 12, 2015)))  Rite Aid contends that it is "well settled [in Pennsylvania contract law] that the parties' contractual adoption of a usage of trade must 'be determined as 'questions of fact' based on the evidence before the trier, not precedent.'"  (*Id.*, PageID.368 (citing D.N. 38-23, PageID.4268))  In response, Humana argues that the arbitrator "considered the parties' factual evidence" (D.N. 41, PageID.9314 (citing D.N. 1-1, PageID.14–15) and "acknowledged

that this arbitration was distinct from *Garbe* and made clear his decision 'did not rest on *Garbe* alone.'" (*Id.* (citing D.N. 1-1, PageID.52))

Under Pennsylvania law, trade usage is "a fact-intensive inquiry." *Walney v. SWEPI LP*, 596 F. Supp. 3d 544, 551 (W.D. Pa. 2022) (citation omitted); *see, e.g.*, *Trustees of Univ. of Pa. v. St. Jude Children's Rsch. Hosp.*, 982 F. Supp. 2d 518, 537 (E.D. Pa. 2013) ("Whether a trade usage exists is a question of fact for the jury[.]" (citing *Albus v. Toomey*, 116 A. 917, 918 (Pa. 1922); *Simon Wrecking Co. v. AIU Ins. Co.*, 530 F. Supp. 2d 706, 715 (E.D. Pa. 2008); Restatement (Second) of Contracts § 222(2))).

Despite Rite Aid's contentions, a review of the Opinion and Final Award shows that the arbitrator did not treat trade usage as a question of law rather than a question of fact.  (*See* D.N. 1-1, PageID.19–39)   At the outset, the arbitrator explained that (1) he was "of the opinion" that the arbitration in this matter has "unique factual considerations that distinguish it" from other arbitrations and court decisions addressing trade usage, and (2) he "carefully analyzed and weighed the implications of the primary appellate opinion on this topic"—i.e., *Garbe*, 824 F.3d at 632— "particularly since both Humana and Rite Aid rely on the decision in crafting their arguments." (*Id.*, PageID.19)   After discussing *Garbe* (*id.*, PageID.19–22), the arbitrator reviewed and evaluated (1) the language in the 2008 and 2013 Agreements (*id.*, PageID.22–27), and (2) policy arguments, and documentary and testimonial evidence presented by the parties.  (*Id.*, PageID.28– 39)   The bulk of  his analysis—eighteen out of twenty-one pages—focused on the facts and evidence before him, rather than legal precedent.  (*Id.*, PageID.22–39)   And "after listening to all of the evidence presented, and upon making credibility determinations as [he was] required to do," the arbitrator concluded that (1) "Humana ha[d] credibly demonstrated that the language of the Agreements, combined with the documentary and testimonial evidence, supports the conclusion

that the parties adopted the NCPDP definition of U&C," and (2) Rite Aid's interpretation of U&C "[was] inaccurate" and "unsupported by the record."  (*Id.*, PageID.39)

Based on the arbitrator's extensive evaluation of the facts and evidence before him (*id.*, PageID.19–39), the Court cannot find that his decision "fl[ies] in the face of clearly established legal precedent."  *Gibbens*, 778 F. App'x at 393 (citing *Jaros*, 70 F.3d at 421).  Vacatur on this basis is therefore unwarranted.  *Id.*

Because Rite Aid failed to "clear [its] high hurdle," *Stolt–Nielsen S.A.*, 559 U.S. at 671, the counter-motion for vacatur will be denied.  *See* 9 U.S.C. § 10(a)(4); *Gibbens*, 778 F. App'x at 393–96.  The Court now turns to Rite Aid's request for modification of the arbitration award.  (D.N. 38; D.N. 40)

## B.    Modification

Rite Aid insists that "[i]f the award is not vacated in full, modification is warranted to correct a material miscalculation of damages and conform the award to the Arbitrator's clear intent." (D.N. 38, PageID.371–75)  Rite Aid specifically argues that there was an error in Petron's damages calculation because it included discretionary "one-time" or "special prices" that inflated Humana's damages award by $41,942,970.  (*Id.*)  Humana responds that Rite Aid's request for modification is unwarranted.  (D.N. 41, PageID.9315–18)

Rite Aid seeks modification under 9 U.S.C. § 11(a), which applies "[w]here there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award."  9 U.S.C. § 11(a).  "By its terms, 'an evident . . . [material] miscalculation of figures' concerns a computational error in determining the total amount of an award—what the Fourth Circuit calls a 'mathematical error appear[ing] on the face of the award.'"  *Grain v. Trinity Health, Mercy Health Servs. Inc.*, 551 F.3d 374, 378 (6th

Cir. 2008) (quoting *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 194 (4th Cir. 1998)).  The error must be an "obvious numerical gaffe in computing the total award."  *Id.* at 379.

As an initial matter, the Court finds that "[n]o such error appears on the face of the award," and Rite Aid has "not pointed to any such error."  *Id.*  Instead,  Rite Aid makes a merit-based argument and asks the Court to find that the arbitrator erred in accepting Petron's calculations.  (D.N. 38, PageID.371–75)  This argument fails because "a mistake on the merits" of the award "is not 'an evident material miscalculation of figures.'"  *Grain*, 551 F.3d at 379.  Moreover, Rite Aid's merit-based argument was already offered to and rejected by the arbitrator.  (D.N. 1-1, PageID.49–51, 54–56)  The arbitrator explained:

> While I recognize and appreciate Rite Aid's argument that there is the potential that additional one-time prices, or special prices, could have been factored into Mr. Petron's calculations, I find that Mr. Petron's analysis accounted for and attempted to mitigate the impact of these possibilities, which is demonstrated by his supplemental analysis.  Accordingly, I do not find Mr. Petron's calculations to be unreliable for these reasons.

(*Id.*, PageID.51)  The arbitrator continued:

> I recognize and appreciate that given the volume of transactions and the limited data available to Mr. Petron, he cannot guarantee that his analysis eliminated every one-time or special price that would otherwise be excluded from a U&C price calculation.  Nevertheless, I find that Mr. Petron's analysis accounted for this possibility through his self-described "conservative approach" to calculating the damages using the 10th and 25th percentiles.  I am satisfied, based on the expert reports and testimony offered by the parties, that the 25th percentile will reduce the likelihood of the issues raised by Rite Aid and reflects a reasonably accurate measure of damages.

(*Id.*, PageID.55–56)  Because Rite Aid has not identified a mathematical error on the face of the award, 9 U.S.C. § 11(a) provides no basis for relief.  *See e.g.*, *Grain*, 551 F.3d at 378–79; *Gen. Elec. Co. v. Anson Stamping Co. Inc.*, 426 F. Supp. 2d 579, 596 (W.D. Ky. 2006) ("[F]ederal courts . . . will not alter an arbitration award where no mathematical error appears on the face of such award." (citing *Apex Plumbing Supply, Inc.*, 142 F.3d at 194; *Holden v. Deloitte & Touche*,

22

*LLP*, 390 F. Supp. 2d 752, 780–81 (N.D. Ill. 2005))).   Modification on this basis is therefore unwarranted.   9 U.S.C. § 11(a).

In sum, the Court finds no reason to vacate, modify, or correct the arbitration award, and therefore Humana's petition to affirm the award will be granted.   9 U.S.C. § 9.

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     Humana's petition to confirm the arbitration award (D.N. 1) is **GRANTED**.

(2)     Rite Aid's counter-motion for vacatur or modification (D.N. 40) is **DENIED**.

(3)     A separate Judgment will be issued this date.

August 4, 2023

**David J. Hale, Judge**
**United States District Court**